Case number 176119, 176233, David Ermold et al. v. Kim Davis. Case number 176120 and 176226, James Yates et al. v. Kim Davis. Argument not to exceed 20 minutes per side. Mr. Gannon, you may proceed for the appellant, Carl Sapperlee. Please state your rebuttal time. Good morning. Good morning. May it please the court. I recognize we have the appeal and we have the cross appeal, but we would prefer that they be argued together. I'm not going to do them separately. I'm not going to have arguments on the appeal and then separate arguments on the cross appeal. So argue both of them at the same time. Understood, Your Honor. I'm Roger Gannon for Kim Davis and the clerk of Brown County. Of my 20 minutes, I will reserve five for rebuttal. Very well. The court should affirm sovereign immunity for the official capacity claims against Kim Davis because she acted for the state in performing her marriage licensing function, and the court should reverse the denial of qualified immunity for Kim Davis because there was no violation of a constitutional right and there certainly wasn't a violation of a clearly established constitutional right. Beginning with the sovereign immunity issue, Kim Davis acted for the Commonwealth in her marriage licensing function. Her duties to issue marriage licenses and really every aspect of marriage licensing clearly flows from the state. This court's opinion in Gottfried in 2001 said that the county sheriff's obligations to enforce a state injunction made him a state official because those duties clearly flowed from the state. And Katie, this court's opinion, a county prosecutor, in entering a plea agreement, choosing what to prosecute, what not to prosecute, even though there was discretion involved, this court held that he was a state official enforcing state duties or state policy. And in that case, the court said the essential question is not whether there is discretion on the part of the official. It's how much discretion is involved. Obviously, prosecutors make myriad discretionary decisions on behalf of the state in the enforcement of state policy. Again, in Pusey, the 1994 case, we have a city prosecutor deciding to reduce certain charges. And again, the court said that prosecutor was pursuing state policy and therefore acted as a state agent. Davis, Kim Davis, upheld and enforced state policy by not only looking at the marriage licensing duties but also looking at Kentucky RFRA, which is a statute applicable to all state statutes and must be read in conjunction with any statute where it may apply. And so RFRA is mandatory. It says government shall not infringe, shall not burden or substantially burden a person's religious freedom. So Kim Davis, when she was asked to issue marriage licenses by Governor Beshear, she faced a difficult situation. She had the marriage licensing duty to issue licenses on the uniform statewide form that Governor Beshear created. And on the other hand, she had the obligation as the government to enforce RFRA, that is not substantially burden religious freedom of anyone in her office, which would include her individually. And therefore she upheld. But herself, she was applying it to herself, right? Yes, Your Honor. This is the legal fiction that we have to deal with just as we can have claims against Kim Davis here that are entitled to immunity as the district court held and claims that are not entitled to immunity as the district court held. We have to respect that fiction that Kim Davis in her official capacity has different rights and interests than Kim Davis in her individual capacity. So Davis exercised her discretion not to issue marriage licenses as a matter of pursuing state policy, just like the prosecutors did. Well, I don't see that she had discretion. Isn't it a misdemeanor not to perform a duty imposed by law on the officer under this KRS 522.020? It is. Well, this is the statutory scheme of marriage licensing was not changed at this point. Wasn't it her duty to issue the marriage license? Well, she had conflicting duties because, again, we have RFRA, Kentucky RFRA is mandatory. It says government shall not substantially burden. So she faced an obligation to balance the interests involved. The marriage licensing statutes at that point were essentially in chaos because Obergefell is not self-executing. The only new law Kim Davis had to work with. But didn't a mandate come down from the governor's office almost immediately giving everybody guidance? Yes, Governor Beshear, in fact, did issue a new marriage license form. Kim Davis objected, again, in her individual capacity because of her religious, her sincere religious beliefs. And in her official capacity, she tried to chart a path between the various obligations that were imposed on her. One, we have Obergefell saying you must treat all couples the same. Two, we have this new statewide marriage licensing form. And three, we have Kentucky RFRA. She chose a course of action that relied on the availability of licenses everywhere else in the state. And certainly in the counties surrounding Rowan County. Did the state give her any direction on how she should enforce or comply with RFRA? Governor Beshear's directive was do your job or quit or resign. We don't think that that's... So wouldn't that be basically to issue the licenses notwithstanding RFRA? That would be, I think, the correct understanding of Governor Beshear's order. But what's caught up in that is the idea that Governor Beshear couldn't do anything else, which we know isn't true. He changed the marriage license form unilaterally without a statutory mandate from the Kentucky General Assembly. In fact, he wouldn't call a special session. Obergefell is not self-executing. It simply invalidated Kentucky's marriage licenses law as they stood. It didn't say here's now how you have to issue marriage licenses. It didn't specify who has to issue licenses or where they had to be issued. And that's why we don't have a... Kim Davis's policy decision was enforcing the dual state policies of getting marriage licenses issued on uniform forms, which could still be done everywhere around Rowan County, and respecting Kentucky RFRA, which says governance shall not substantially burden religious rights. And so when we look at the other cases that have been cited so far, she was not like the coroner in Brotherton or the sheriff in Crabs or the district attorney in the Crane case, all of which have been cited by Appelese. In those cases, those officials either had no statutory mandate to do something in particular or they had statutory permission to do something but no guidance as to how it should be done. In each case, they came up with arbitrary, original, voluntary policies that had no interaction or no involvement. That's what she did. She came up with a policy that said we're not issuing any licenses. Well, her situation is different because in the other cases where so much discretion was exercised, the court said they were acting as local officials. They had no involvement with other state officials in their policy. They made it all up themselves. Kim Davis reacted to a new state policy from Governor Beshear saying you're not entitled to an accommodation. We have to view it in the context of the subsequent executive order from Governor Bevin that affirms she was entitled to an accommodation because his executive order, which is equal at least in authority to Governor Beshear's, said Kentucky owes you this accommodation. It owes an accommodation to county clerks, and therefore we're going to change the form. Kim Davis's policy, it was interim. It was fluid. It was something that was reacting to state official action. She was pursuing, promoting state policy. I'm a little confused about what issue you're addressing right now. Are you arguing for qualified immunity now, or are you still arguing that it was state? She was acting for the state. There's certainly overlapping consideration, but she was acting for the state, and my point I'm making is that she was pursuing at all times enforcement of state policy, conflicting state policies, competing state policies, just as prosecutors are called to do in their discretion in entering plea agreements or deciding what to prosecute. They're always balancing competing state policy interests. Kim Davis was affirmed that she was promoting state policy when Governor Bevin said clerks are entitled to an accommodation under Kentucky RFRA. So Kim Davis was acting at all times in promotion of state policy, and therefore she shouldn't be held to be a purely local official for purposes of sovereign immunity. Now I'd like to turn to the qualified immunity question. The question here is a little different. The first question we have to ask is, was there a violation of a constitutional right? And that happens to also be jurisdictional. If there was no violation of a constitutional right, there's no case at all here. The relevant inquiry here, we think, is whether Kentucky violated the right to marry of the plaintiffs, and we think the answer is no. Kentucky suspended marriage licensing in one county to accommodate a religious objection, while Kentucky provided licenses in all the other counties that surrounded it. You're talking about her getting sued individually, aren't you, on qualified immunity? That's correct. Okay, so why are we talking about Kentucky? Well, because we're talking about whether there was a violation of a constitutional right in the first place. We only get to her individual liability if there was a violation of a constitutional right. Well, I mean, they're saying it looks like Kentucky did what they were supposed to do after the Supreme Court ruled, but their argument is she ignored not only the Supreme Court, but she also ignored the directives from the governor, and that her decision just to violate both directives, she is individually not entitled to qualified immunity. Well, I disagree that there is a violation of Obergefell, because it said same-sex couples must be treated on the same terms as different-sex couples. Yeah, and she said, I'm not going to do that. She refuses to enforce the Supreme Court decision. Well, I disagree. I think Kim Davis treated all couples the same. That was the policy decision she faced. She could have just issued licenses to different-sex couples. That would have created another constitutional issue. That would have been an equal protection problem, and that would have violated directly what Obergefell said. She chose to treat all couples the same, trying to maintain the statewide uniformity of marriage licensing while at the same time accommodating the religious liberty interest. So what we have here is a situation where the government clearly can require licensing in the first place. The government can require someone to go to a clerk's office to get a license. Requiring a person to go just one more county over to get a license is only incrementally more burdensome than what was clearly allowed. And this case isn't even like the states of Maryland, for example, where you have to get a license in the county where the ceremony will occur. So there's no constitutional right to get a marriage license in your own county or in your home county. If Kentucky required that, if Kentucky required marriage licenses in one's home county, this would be a completely different case. But Kentucky doesn't. Kentucky allows you to marry on a license obtained in any county in the state. And so there was never a time when the plaintiffs or anyone else were unable to marry in Kentucky. So if they didn't say they didn't admit African-Americans to the school, well, you can go to the school in the county over, so you're not burdened because you can drive 30 miles away and go to the next school, so there's no burden, there's no violation. I mean, that doesn't make any sense, does it? I don't think that's analogous, Your Honor, because there was never a time when you couldn't marry in Rowan County. The state can issue marriage licenses through county clerks or it could issue marriage licenses through magistrates or probate judges. States all do it differently. The state of Kentucky could decide to issue marriage licenses from regional offices that cover several counties. What we have here is a situation where Kentucky was issuing marriage licenses readily available. Well, anyway, I'm not real persuaded by that argument. But your next argument is you claim that the Supreme Court decision did not clearly establish the law here. How did it not clearly establish the law? Obergefell clearly established a principle that the fundamental right to marry belongs to same-sex couples and that states must treat same-sex couples on the same terms as different sex couples. That's all Obergefell said. It's up to the states then to implement that. Kentucky did that. Eventually, the Kentucky General Assembly unanimously passed a wholesale revision of its marriage licensing statutes to implement what Obergefell required, and also it accommodated what Kim Davis asked for, which is taking clerks' name and authority off of marriage licenses. So what Obergefell decided isn't really the issue here. The fundamental right to marry was not violated. There was no direct and substantial burden placed on any plaintiff's ability to marry, and therefore the policy is only subject to rational basis review. Religious liberty is a legitimate interest. Did it substantially hinder their ability to marry, the fact that the county clerk is not going to do it, that you'd have to go to a probate judge or you'd have to go 30 miles away? That's not a substantial burden on the right? No, Your Honor, because what the marriage cases Loving and Zablocki and the Sixth Circuit cases Montgomery and Vaughan teach us is that unless a person is entirely or largely prevented from marrying or cut off from entirely or largely from a large percentage of the population, then there is no direct and substantial burden. And the best example is the state nepotism law that would require a couple who works for the same school, for example, to have to go to another school so that they could marry, even if that meant driving an hour every day, whereas driving once to another county for a five-minute marriage license transaction that allows you to marry anywhere in the state is not a direct and substantial burden. Is it a burden? Yes, but it's only incrementally more than having to get a license or go to a clerk's office in the first place. And where the district court got this wrong was assuming without any allegation that there are residents of Rowan County that are physically and financially able to go to the Rowan County clerk's office but are not physically or financially able to go to another county's clerk's office. That was not a fact in the record, and it was never alleged by any of the plaintiffs here that there was any obstacle to going to another county, to the neighboring county, to get the license. They don't have a car. Are they supposed to take a cab or take a bus? Or how do they get to the other county? I mean, not everybody has a vehicle. And that would be the same problem to get to the Rowan County clerk's office. There's no difference that's substantial enough to take this from a burden that's acceptable under the Constitution to a direct and substantial burden. And so because rational basis review is satisfied by the policy and that's all that's required, she should be entitled to qualified immunity. And I'll say the rest of my time. Very well. How much time did you reserve? Five minutes, Your Honor. Good morning. Good morning, Your Honors. May it please the Court, my name is Michael J. Gartland. I represent David Moore and David Owen. I'm going to ask you to keep your voice up also, okay? May it please the Court, my name is Michael J. Gartland. I represent David Ermold and David Moore, the appellants, cross appellants in this case. The reason you might have a hard time hearing me is this morning, yesterday I had temporary veneers put on. This morning on the way up here, I was pressing some buttons on the car with my glove and they wouldn't work, so I used my teeth to pull them off and it cracked the veneers. So it actually hurts to talk when the air hits them. And certain words are not being pronounced correctly, and forgive me for that. I was told to be careful, but apparently I wasn't. Here we are. Thanks for telling us that, anyway. I cracked my tooth the same way. Your Honor, I'm... You guys have split up your time, is that it? Well, I think the clerk was of the view that the county's attorney was an appellee, so she gave her five of our minutes. We really have 20 minutes and I don't really care how we split them. Well, I care because you get 20... Ten and ten. You get 20 minutes between you. Okay, all right. And we're arguing both the appeal and the cross appeal together. Okay. We think that the easier issue is our cross appeal, the issue of sovereign immunity. The question is was she a state actor? And the court hit the nail on the head when they talked about the directive, the directive that was issued the same day Obergefell came out. And Governor Beshear said it's clear that the states, all states, must license and recognize the marriages of same-sex couples. Same-sex couples are entitled to the issuance of a marriage license. And we know that the issue, the very first issue decided or discussed or stated in Obergefell was whether or not there is a 14th Amendment that requires states to issue a marriage license. Now, Mr. Ganim said that the state of Kentucky made a policy decision not to issue licenses in one of its 120 counties. We know that never happened. That never happened. But under Krabs, we would look at six counties. It didn't make a policy decision, but it did sort of assume the risk that a clerk wouldn't issue a license by the way the statutory scheme is set up. I mean, there's no other official out there who can issue licenses, right? Under the statute that existed at the time, only Ms. Davis could issue the licenses in Rowan County. Well, we know that deputy clerks issued the licenses before they changed the law. But that would have to be done with her approval, apparently. Perhaps, yes. I guess my point is, why can't we say she's a state act or the state assume the risk that they would have an errant county clerk in the way they set up the statute? And the fact that she wasn't following what the governor said is really beside the point. The state has already put themselves in a position of being responsible for her acts because that's the way the statute reads. Because the policy that she implemented was not required to enforce state law, and under Krabs, that makes her a county official. In other words, if she creates a state widespread policy not to issue licenses, it's a violation of state law. That doesn't make her a state actor. That makes her the opposite of a state actor. The statute says that in order to get a marriage license, you have to get it from a county official. That's what the state enacted. It's true. Okay. They could have enacted it that it's up to each local county whether you get a marriage license and how it's to be issued, but they didn't do it that way, they said. So it seems to me that they've already established that she's a state actor by the way the statute's set up. That's how I'm reading it. Well, we would disagree under the Krabs case. A county official can wear multiple hats doing a state function, but where they implement a policy that's not required to enforce state law, under Krabs they are not a state actor. They're now a county official. And it was her policy, and let's make no mistake about it. Kentucky didn't enact this policy. Ms. Davis did. She took it on herself to do that. And she did it with the sole purpose of she didn't believe that gays and lesbians were entitled to a marriage license. So what she said was, well, I won't issue any license. And the state never attempted to prosecute her for a violation of 522. As far as I know, that's correct. Right. But, I mean, do we look at her specific, for sovereign immunity purposes, do we look at her duties or whether she violated her duties? I mean, I thought we would look at the duties. Like the duties here, does it rise from her hat of a state official or do her duties of issuing the license arise from her hat as a county official? And I think we kind of agree that, no, it's state law that controls marriage in Kentucky. So it's a state function. Your argument is she deviated from her duties and therefore she's not a state official. But I don't know if that's the analysis we ought to do. I think we ought to look at what she should have done to see. If, in fact, she had a right under RFRA to do something to accommodate her religious belief, she could have merely altered the form as she did before she went to jail and when she got out of jail. Before anybody blessed her change to the form, she had three issues with the form, the authorization, her name, and her title. Well, she could have done that. What would be more invasive or what is worse, to say no licenses will get issued or to do that? If she had done that, those licenses would have been legal under Kentucky law. We know that. So she had a choice to make. But to issue no licenses, we don't think that that's a choice that she actually could make without subjecting herself to liability. I don't agree with my question. I mean, do we look at the duties that she should have performed or do we look at the violation of the duties that she actually performed for sovereign immunity purposes? I think you look at what she didn't do. When a state official is not carrying out. . . A state official, I think, is entitled to sovereign immunity even when that state official does something wrong. And usually when they do something wrong, it's because they violated the duties. But that doesn't exclude them from sovereign immunity because they screwed up. But that's kind of what you're arguing. No, I think what I'm really arguing is that she, under Krebs, she implemented a policy that was contrary to state law. Okay, but there is no. . . The policies for marriage all come from the state. They don't come from the county. And what she did by her own policy is making up her own policy. But getting back, I think sovereign immunity, we look at where the duties arose from. But, okay, I guess I understand. Well, that is the crux of it. I think that tension between acting within a legislative. . . within a scheme that gives this county official responsibility for executing this state scheme for marriage licenses. So if she was issuing them, she'd be a state actor. We would agree with that. Subject to the state sovereign immunity. And then the question is, well, if she doesn't issue them, does she become a county actor because, on the theory, that she's no longer executing the state's plan? Or do you just say, well, she's a rogue actor, but she's still a state actor? We think it's the former, not the latter. No, but what's the rationale for that? There is no county policy. She's making it up. She's going rogue, is she not? Well, she did, yes. Yeah, okay, so there is not a county policy. She's going rogue and making up her own policy as she's going along. So, I mean, I think Judge White is right. I think she's still a state actor because she's not following a county policy. She's following her own policy. Well, she's making county policy. Well, does she have power to do that? I don't know if she had the power or not, but she, in fact, did it. Okay. Can you sort of try to untie that knot a little as to why she becomes, at that point, a county actor as opposed to a state actor? Other than the argument we made in our briefs, which really comes down to Krabs, if she wasn't required to do what she did, then she's a county official. That's what Krabs holds in implementing a widespread policy where she's wearing multiple hats, and we think that's the answer to the question. And is marriage license, is that analogous to these other situations where the actors try to say, well, I was doing this under state policy. I have to have sovereign immunity. None of the other cases that we cite were marriage cases, the failure to issue licenses. That's true. Do you see any difference between the marriage situation where it's totally regulated? Well, the things that were being done in these other cases, there were state statutes that were regulating the removal of cornea or the DNA swab test that was administered in Krebs. What? I didn't hear what you just said. The DNA cheek swab, which was the Krebs case. That was an Ohio law. And was there a state statute in that Krebs case requiring the state actor to do the cheek swab? Well, he was supposed to do the swab upon a felony arrest, not after somebody's acquitted and they're on their way out of the jailhouse. He's not supposed to swab. That's what he did. That's right. But it was a local policy to do the cheek swab as opposed to a state statute telling him to do the cheek swab. Here we have a state statute telling Davis to issue marriage licenses. Was there a statute involved? There was a statute involved in that case saying do it at the time of arrest. Okay. And he did it at a different time. He did it at a different time, which wasn't permissible under the statute. And in that case they held that he went outside the bounds of being in sovereign immunity, wasn't entitled to protection, was acting as something other than a state official. We think that case is the closest one to this case. I recognize we've used your time on the sovereign immunity, but if you want to briefly talk about the qualified immunity issue. Well, as to the qualified immunity issue, there's no question that my clients were entitled to a marriage license. That's what Obergefell holds. Then the question becomes whether or not what she did was reasonably related to a legitimate government interest, and we say the answer is no. Then they say there's no substantial burden of what she did. Right. I understand. But if there's a less intrusive alternative, for instance, the case that comes to mind. Do you agree with them that there's not a substantial burden here? Well, in our brief I think we kind of conceded that if it's rational basis, and if she's a state actor, having to drive to another county is perhaps not that burdensome. All right. I tend to disagree with you, but okay. Okay. But if there's less, we know from the Turner v. Soffley case, the United States Supreme Court case, which involved marriage, in a prison where the prison just outlawed marriage altogether, the court overruled that decision saying there was a less intrusive or invasive procedure that you could have implemented, therefore it wasn't reasonable. Well, rather than not issuing licenses to the whole county, she could have done what she did, which was alter the form under RFRA. So we would think under Soffley what she did doesn't stand. I'm sorry. She could have altered the form? Well, she did in fact alter the form to remove her name and title, which was her only objection to the issuance of the form in the first place. She did that on her own. And you believe that would have complied with the law as it existed at that point? Well, the license still would have been legal. The marriages that were solemnized with that license would have been legal, and that's clearly established Kentucky law for over 200 years, that a merely defective form doesn't affect the validity of a marriage. So that's what she should have done. And so that would have been a reasonable approach, we think, and that's ultimately what she did do, and ultimately was blessed by Governor Babbitt. But you objected when she did that, didn't you? She didn't do it for us. A deputy clerk issued the license to my clients. Okay, but somebody objected to that process of changing. Didn't somebody? Didn't one of the plaintiffs object to that? Not in my case. That they were getting different marriage licenses? Not in my case. That's not part of our complaint. Okay. All right, any further questions? Thank you, Counsel. Good morning. Good morning, Your Honors. May it please the Court. Cash stills. I represent Will Smith and James Yates. The only thing I would like to add to the sovereign immunity issue is, in my opinion, the Brotherton case is directly on point. That's the doctor that was harvesting corneas that implemented his own policy. Ohio law allowed him to harvest the corneas, and he implemented a policy of, I think they called it intentional ignorance, where he wouldn't tell the families he was doing it. He did that on a countywide basis. It was a widespread policy. And in that case, Brotherton said, even though state law permitted the action, and perhaps he's doing it correctly, he's wearing a state hat. Because his policy goes rogue from state law, he becomes a county official. I think that's what Brotherton says, and I think that's exactly what happened in this case. Well, but the difference is, and I'm somewhat on the fence on this, but the difference is that the whole area of marriage licenses is regulated by state law. I mean, it's what you need, what the clerk's supposed to do, it's just all laid out there. Where with the coroner, he had, there was a statute that told you what you had to do if you wanted to harvest corneas. Well, I mean, he didn't, he wasn't obeying it, and then he tried to say, well, I have immunity because I'm following this state statute. And the court said, well, you're not. I mean, you weren't following it. You had a completely different policy. So you're not going to make yourself a state actor by doing that. But this is a little different. I don't see much of the difference, Your Honor. I think if, and I think what the, perhaps the terms that case uses, and I think I'm getting this right, is when an officer is mechanically doing their job. I'm sorry, I'm losing the end of your sentence. Can you please speak up? Sure, absolutely. When a state official is rotely or mechanically following law, for instance, in our case, let's say Ms. Davis is issuing marriage licenses. She's a state actor when she's issuing them. When she implements a policy contrary to state law, and I think in your words, Your Honor, use the word rogue, I would agree with that, and decides not to do that, she puts on a county hat, and I think that's what Brotherton tells us. So what do you make of Judge Martin's dissent in, I think it's the Katie case, where he basically says the same thing, that, I mean, the majority, with the prosecutor, the majority says that the prosecutor is a state agent, and even though he had discretion to require that cooling off period, and Judge Martin writes separately, and he tries to make the point that you're not a state actor unless you are sort of rotely enforcing a state requirement, and the majority didn't accept that. Well, perhaps it was because the facts of that case maybe didn't fit the argument. I mean, I would agree with Judge Martin that that's how that works. I think I pulled this from the majority opinion. In that case, when they were describing what Brotherton says, the Brotherton court explained that when considering whether a contested policy is a state policy, the essential question is the degree of discretion possessed by the official in question in implementing the contested policy, but the language of Brotherton makes clear that the essential question of discretion applies only to policy choices and not to the individual acts by the official in enforcing state law. So I think what that says is when the county official creates their own policy contrary to state law, they're not a state actor, and that's really all, unless the panel has any other questions on that particular issue, that's really the point that I wanted to make. As far as qualified immunity is concerned, you could tell from my brief, I basically piggybacked on Judge Bunning. I think he got the analysis of that absolutely correct. To your point, Judge Griffin, about whether or not this was a substantial burden, excuse me, obviously we believe it is. We don't concede that this is rational basis scrutiny. Judge Bunning applied strict scrutiny to this, and I think that was the correct way to analyze this issue. And under strict scrutiny, her policy clearly is not going to withstand muster. It's not going to stand up. All right. Any further questions? Thank you, counsel. Thank you. Rebuttal. Good morning. Good morning. My name is Mary Ann Stewart. I represent Brown County, who I think is an appellee, but I've been told we're appellate, so I'm not sure exactly what we are. I'm just here to represent Brown County. I'm also here just to address that narrow issue in Judge Bunning's opinion as to who pays. Was she functioning as a county official when she refused to issue the marriage licenses or as a state official? I think there's been a lot of discussion already, and I won't necessarily rehash what the court has already addressed. However, we agree with Judge Bunning that marriage is essentially and absolutely a state function. That is clear under Kentucky law. The United States Supreme Court in the McMillan case tells us that when we're looking at this issue, you don't look at it as a general what is the label of the county official, county clerk. Instead, we look at the function in which she is acting in. In this case, issuing marriage licenses is clearly and absolutely a state function. It is governed by Chapter 402 of the Kentucky Revised Statute. In KRS 402, county clerks are charged with issuance of marriage licenses. They are charged with the ministerial duties of recording them, reporting them to state agencies, collecting the fees for them, and remitting part of those fees back to the state. Additionally, in this case, the actions of the two governors buttress the conclusion that she was acting as a state actor at the time that she refused to issue the marriage licenses. First, you have Governor Beshear issuing the order to the county clerks, not Rowan County. Governor Beshear issued the order directing her to comply with the Oberfeldt decision. When she disregarded that later on, Governor Beshear, when she disregarded that order and those of the district court, it was Governor Bevin who then issued orders. In that case, he issued an order to the Kentucky Department of Libraries to alter the form, which, by the way, is a statutory form that all county clerks have to follow and the state states exactly what is in that form. Under Governor Bevin's orders, KDLA was directed to change the form to accommodate Kim Davis and to remove the signature line for the county clerks on the marriage licenses. Following that lead, the Kentucky legislature then amended the statute pertaining to the marriage license form to remove the signature of the county clerks from that form. Clearly, this is absolutely all of those are actions by the state. The county has no jurisdiction under KRS 402 with respect to marriage licenses. That's really the key here is that he is the function that she is acting in. It's not, does she happen to be a county clerk? Nor is it following in the line of the cases of Brotherton where there was a degree of discretion because here we have statutes that set ministerial duties. There are other factors that support that she is acting as a state actor. In Kentucky, only the state exercises control over the county clerks in terms of removal of a recalcitrant county clerk. Only the state can remove. The county cannot take an action to remove. The state can remove through the power of impeachment. Only the state through criminal action can sanction or penalize a recalcitrant county clerk. The county has no such authority. Only the state can require the county clerks to post a bond and collect on that bond. Again, the county does not have that authority. Based upon all of that, it is our position as Rowan County that Judge Bunning's order assessing the attorney fees to the state is correct. He correctly followed the guidance of the Supreme Court in McMillan. We're not on the attorney fees appeal. We're on the sovereign immunity, qualified immunity appeal here. I'm not sure exactly where I was supposed to go. No, we're arguing the next case. The next case is the attorney fees appeal. But we've kind of talked about her as a state actor in this case.  The problem is that there are other things that the clerk would do that would be county. Wouldn't there be? Yes, there are other things that she would do. But the fact that she can only be disciplined or removed by the state, that doesn't change. That's there all the time. Right. It is not the governing factor. But I think it's a factor you have to keep in context with KRS 402 in terms of the state setting out the ministerial duties with respect to marriage licenses. These are additional factors. But I do agree that there are some county functions. Why can't you also say, which I think is what your opponents are saying, that the state mandate was clear. She came up with her own county policy that this county doesn't issue marriage licenses. That was completely different from and contrary to the state policy. My response to that would be that there is no body of law that converts if, in fact, she is doing that. If, in fact, she is acting outside of the state policy, going rogue, so to speak, there's no body of law that says, well, that converts that now to county action. There's no body of law that states that. And it doesn't convert it to county action because, again, it's not the action. It's the function that she is acting in. It is issuing the marriage licenses. Who takes jurisdiction? Which is the case that says it's the function and not the action? Because some of the cases figure out. I mean, one of the ways they figure out who you're acting for is to actually look at the activity. Like I think Brotherton does that and some of the others. What did they really do? What were they compelled to do? So what case are you relying on to say, no, the focus is on the function. And not the action. And I'm relying upon the Supreme Court's holding in McMillan. McMillan, okay. Thank you. Thank you. Now we get to the rebuttal. I'd like to begin with a question that Judge White had about who objected to the change in the marriage licenses. And that was the Miller plaintiffs. The case we'll argue next. But that record is so intertwined with what we're doing here. We can say that we know that when the marriage license form was changed by Kim Davis, after she got out of jail and the governor said that's okay and the AG said that's okay, the Miller plaintiffs wanted her held in contempt a second time, claiming that this created a two-tiered marriage license system and bore a stamp of animus towards LGBT people. Now we disagree with that, but it illustrates it's not a cut-and-dried situation where she could have just changed the marriage license form at the outset. In fact, because it's her very authorization that she objected to being on that form, only clerks under the statutory scheme can issue marriage licenses. So if Kim Davis withholds her authorization from that license, that's more like a license that's not valid at all. It's not like just making a minor mistake or a clerical error and filling it out. So we don't think it was reasonable in the first instance just for her to assume that she could unilaterally change the marriage license form. She only did it after she went to jail and then her deputies issued licenses that were changed and the district court said that's okay with me, I'm going to let you out of jail sua sponte. That's when she said, well, if that's allowed, I'm going to change the license, and then the governor and the AG said that's okay. So it was reasonable for her to want to maintain the uniformity of the state marriage license forms, perhaps anticipating the kind of objection that did happen in Miller rather than just change it herself at the outset. Now think about Brotherton. If Brotherton is the case that applies here, then I think Kim Davis is a state official, and that's because in Brotherton the removal of the corneas in the first place, it wasn't mandated by statute. It was only permitted. And then the coroner went a step further and sort of instituted this I'm not going to pay attention to objections and just harvest as many corneas as possible. And so in the Brotherton case, there was no countervailing state mandate to collect corneas at all and certainly not to collect them over the objection or ignoring objections. Kim Davis had a countervailing state mandate in RFRA. Now even if the court disagrees and thinks that she got that wrong, it was at least reasonable. It was at least objectively reasonable for her in this position with a brand-new Obergefell decision trying to figure out the place to chart a course through the religious objection and the new requirement. That was at least reasonable for qualified immunity purposes. It wasn't clearly established that she was wrong. It wouldn't have been clear to every other clerk under those same circumstances that that was the wrong thing to do. And when you look at Governor Bevin subsequently entering an executive order that says RFRA applies and these clerks are entitled to an accommodation, it only bolsters the order said that RFRA applies, that the state owes clerks the obligations of RFRA to not substantially burden their religious liberty or their religious freedom, and therefore it's easy for us to change the form rather than force them to face a do-your-job-or-quit proposition like Governor Beshear said. And then you have the president of the Senate who filed an amicus brief that says, look, Kentucky marriage license statutes are shredded by Obergefell. We have no proper guidance for clerks on what to do next. We need to change the marriage laws. But there was not an opportunity to do that until the General Assembly met again. Another point I want to make, and I think this was a point that Judge Griffin was making, is that if every violation of an official's state-mandated duties rendered that official no longer a state official, it would really obliterate the whole sovereign immunity concept. What we have with Kim Davis's situation is if she's a state official, if she gets something wrong, that doesn't automatically convert her to a county official. And what we see, again, in the Brotherton case, you had no countervailing state mandate to justify in any sense what the coroner did, whereas in the Cady case, the plea agreement case, there we have what's recognized as, look, state officials exercise discretion on behalf of the state all the time, and a state official in this county prosecuting state criminal laws won't always make the same decisions as a state official in this county prosecuting criminal laws. But it's possible to exercise discretion on behalf of the state, and we're arguing that's what Kim Davis did. And if the court disagrees, we're arguing it was at least reasonable for her to think that that's what she was doing, even if the court— What makes this case complicated on the sovereign immunity is that I don't think Kim Davis had authority to institute a policy on a countywide level that the policies all come from the state, which would make her a state official. But although she has no discretion, no authority for a countywide policy, she tried to do it. And the question is, did the attempt to do a county policy when she has no authority to act, no authority to do that, all of a sudden transform her into a county official because she purported to do it, I guess. And Judge Griffin, I think that's a good framing of the question. And I think RFRA at least says she had a reasonable belief that she could do it. And Governor Bevin's subsequent executive order, I think, reinforces that, so that it was at least reasonable for her to think she had that power, even if the court concludes she ultimately didn't. You're arguing that she's a state official, not a county official. My question was going as to sovereign immunity, though. Well, I think it's correct to say that if you're a state official performing state functions and you get that wrong, that doesn't convert you to a local official. If you're a state official and you think you're all of a sudden instituting a county policy and you're wrong, I mean, are you a state official or a county official? Well, I guess I would just disagree with the premise that it's a county policy to the extent that. . . I think she tried to do it, didn't she? Didn't she try to make this the county policy? Well, she did something in her county as a state official, which is what prosecutors do all the time. Where you get in trouble is where you depart too far from the statutory mandate, so that if you're collecting corneas for profit, for example, or in another case if you're instead of taking a cheek swab when a person is arrested, you take the cheek swab after they're acquitted. That's too far away to say that. . . All right, any further questions on this? This is the immunity appeal, whether there's immunity, whether it's sovereign immunity or qualified immunity. And with that, the oral argument's completed. The case will be submitted. Now we'll move on to the attorney fees appeal. So you may call the next case.